All right, our last case this morning for oral argument is Roland v. Letgo 22-1456. You may proceed. Good morning. May it please the Court, my name is Daniel Tepetillo on behalf of Appellant Madison Roland and her siblings. Now, the facts of this case are pretty simple. Letgo is a billion-dollar enterprise that has distinguished itself from its competitors based upon its safety features, more specifically the fact that it works closely with law enforcement, that it verifies its users, and that it utilizes anti-theft technology. However, in August of 2020, what occurred is that the Rolands, relying upon these safety features, used the Letgo app, started communicating with a profile that had been verified, meets with a James Worthy, who we now know is to be Mr. Kyrie Brown, and as a result of the interaction, he ends up shooting them and stealing $3,000 while he murders the Rolands. Now, the trial court erred for numerous issues. They dismissed all the state law claims based upon the fact that it would be futile to be able to cure any of its defects. However, the issue is that the ability to amend the pleadings is liberally granted, and so therefore, the court should have allowed the plaintiffs to have been able to cure the factual defects, if that were the case. They didn't state any other basis of futility as to why they didn't let the appellants amend the complaint. Now, the state law claims on appeal are negligence, negligent misrepresentation, fraud, Colorado Consumer Protection Act violations, and wrongful death claims. Can you start with the one where you think the district court made the most obvious mistake in dismissal? Which of the state claims? Sure. I would go with negligence. Now, where the trial court went wrong is that before you proceed with a negligence claim, you need to decide whether or not it's nonfeasance versus misfeasance. And what the trial court did is dismiss the plaintiff's claim on a nonfeasance theory. Now, that's because what they're saying is that our argument is that Letgo did not try and prevent the killing of the Rollins by Mr. Brown. That's not what we argued. That's not what we ever argued. What we argued was under a misfeasance claim is that Letgo, they were the ones who committed active misconduct, and they were the ones who committed the risk of harm, which caused the Rollins to trust a profile they otherwise would not have trusted, but for the verification tag that they placed on Mr. Brown's profile. Didn't their terms, though, expressly disclaim the trust that was placed in them? Didn't they warn on their terms that you needed to proceed with caution in these transactions, that they wouldn't be responsible for them? So in the boilerplate language, I believe if you clicked several websites and went looking for it, at some point, yes, they would have come across it. The issue is that what they have profited on is the fact that they advertise everywhere that they verify its users, that they have a hand in verifying their users, the fact that they work closely with law enforcement. And so someone who is just randomly clicking on the app, typing in a few things, what they see is that they're going to choose to offer up Letgo over its competitors like Craigslist, which offered no such advertisement on its home page. Do you think it's reasonable to say that just accepting what you say right there is true in the way they hold themselves out? Do you think it's reasonable for consumers to identify the harm that this verification is protecting them from as being a harm from personal injury as opposed to a harm from being defrauded or scammed? Oh, absolutely. Because if you were to ask a reasonable person why they choose to not use Craigslist, people are going to say that they would set themselves up for potential armed robbery and or even up to murder. I believe that people are very wary of using websites like Craigslist, eBay, unless it's through the mail, to use those websites in that they have to use extra precaution to be able to take advantage of any interactions that go on through those websites or those platforms. Also, those platforms don't make any reassurances that they're going to help you in any way, shape, or form. I mean, doesn't eBay have certain sellers that they give the stamp of approval to people who have done lots of transactions? In fact, they rape them. Yes. eBay does. Yes. Now, I believe that's predominantly through the mail, and so therefore there's no person-to-person contact. They offer up, let go, distinguishes themselves that they have an app, they let you converse with each other through their app to exchange information, to get into a meeting place, but also at the same time, reassuring its users that the person you're communicating with has been verified by them. How does the amended complaint adequately allege causation on your negligence claim? So, now the trial court didn't let us cure any of the defects, but as far as causation is concerned, the Rolands would not have utilized offer up, let go, had it not been for its safety reassurances and the fact that Mr. James Worthy or Kyrie Brown was a verified user. Now, we do, although they are no longer with us, we do have their daughter Madison Roland, who was 17 at the time, almost an adult. She was involved with her parents looking for vehicles, and the only reason why she wasn't there that night is because she went to go with her boyfriend, be with her boyfriend, and so therefore the parents went to go make the transaction without her. So we have firsthand knowledge as to the fact that the parents did utilize offer up, let go because of its safety reassurances. Had that not been the case, they would have never trusted this profile and met with a convicted felon. Well, that sounds like a but-for causation argument, but wasn't Mr. Brown the predominant cause of the murders? Sure, and as far as foreseeability is concerned, yes, absolutely. This is absolutely foreseeable because what let go offer up was doing is they advertised that they put these verification stamps of approval on only its verified sellers, but the problem is that they hand them out to anyone who's a participant, to any active email address, so they really have no idea who's getting this verification stamp. And so if you just continuously just give these out to any active email address, at some point, obviously, the wrong type of people are going to obtain these, take advantage of the system, meet up with the Rolands like Mr. Kyrie Brown did, and so therefore let go offer up is the one who set in motion the murders of the Rolands. Just one more causation question. Is the causation standard for your negligence claim the same as it would be for your other state law claims? They all require some showing of cause. Yes. And not only that, what I would like to highlight is although our brief does cite a 10th Circuit case that does apply Oklahoma state law, I did want to say that that type of case law or theory is prevalent upon 10th Circuit cases that do rely upon Colorado state law. Danes v. Atlas Energy Services states that an intervening act of a third party, even an intentionally tortious or criminal act, does not immunize the defendant from liability if the intervening act is itself reasonably foreseeable. To absolve the defendant of responsibility, the intervening cause must be fully independent of and not have been set in motion by the original negligence. Would you explain how the information on the website was misleading on the app? This one had verified with the telephone symbol, and I gather from the underlying materials that means that he used a real phone number to set up his profile, right? So what we now know, yes, based off of these pleadings and based off of the trajectory of this case, yes, now it's clear what let go and offer up do and don't do. As far as the common user goes, when you go on their website, it says that they verify their sellers, that they work closely with law enforcement, so they give this impression that they have a hand in verifying who is behind this. And so therefore, people have this false reassurance that they're speaking to someone with a little bit of credibility or are reputable. Now that we've dissected what all of these symbols do mean, yes, if you go through their boilerplate language or you go through multiple webpages, then you can find out exactly how to verify and how to obtain badges and earn credits. And it's this whole verification system that they've set up that they don't let you know until you do quite a bit of research. Well, then what was misleading about it to the Rolands? To the Rolands, that they were speaking to someone who was reputable, credible, that in fact had been vetted, that they were speaking to someone who was going to sell what they say that they were going to sell. And what was the basis for that perception? All of the advertising and marketing that they do to distinguish themselves from their competitors, that the competitors don't do. They're the only ones who supposedly offer this type of reassurance or technology that they're engaging with people with credibility. Did you allege that they chose LetGo because of the advertising and marketing? I mean, the fact that they do it is one thing. The fact that the decedents chose them for that reason is another altogether, right? And I do agree with you. And I believe if it's not already in the complaint, that's one of the defects that could have been cured had the trial court allowed us to be able to make those. Do you have any affirmative allegations in the complaint that your clients chose the app because of their own personal safety? Again, after speaking with their daughter, after in preparation for this hearing, yes, in fact, we do know that the Rolands chose to offer up LetGo specifically for their safety features because they believed that it was going to, they believed that they were going to get a great deal on a 2017 Toyota for their daughter. Did the plaintiffs actually move to amend the complaint and or explain how they would amend the complaint? So what happened in the case is that they filed their motion to dismiss, and in our opposition, we asked for leave to amend if the court were to grant the motion to dismiss. Don't our cases require you to do a little more than that? So during arguments with trial counsel, they asked specifically how we would amend the complaint, and that's where it was addressed, how we would cure them through the daughter's testimony. But you did file one amended complaint already, right? Yes. Do you want to say anything about the Section 230 issue? Sure. As far as the Section 230, that is the part where the trial court did get it right. What they did is that they were able to distinguish that although Mr. Brown uploaded pictures and information, it was the verification tag itself that was generated by LetGo OfferUp. Kyrie is not the one who placed that there. The trial court did highlight the fact that he input his number, LetGo OfferUp sent a confirmation text message, he confirmed it, and then therefore it is designated. Now, appellees in this case do argue on their cross-appeal that it's all auto-generated much like a hot tub icon, but the difference between that is it's an icon that's generated as opposed to adding any credibility to the quality of the hot tub, whether it's a good hot tub, whether there's a warranty on the hot tub. Here, they verify their user. Now, there is one case I did want to discuss, the Ripple v. YouTube case, where they say that the factual basis of that case is that there was cryptocurrency on a channel on YouTube, and so YouTube put a verification badge on that channel, which supposedly let its users utilize the cryptocurrency. Go ahead and finish your comment. Thank you. But the problem is that in that case, everyone assumed that YouTube is the one who created that verification badge. There was no question as to whether or not the channel creator is the one who created it, and at issue in our case is who put the verification badge on Mr. Brown's profile. Thank you. Thank you, counsel. May it please the court. Ari Holzblatt for LetGo, presenting the joint arguments for both defendants. I will try to reserve a couple minutes in case the court has specific questions for offer up as council to answer or if the court has additional questions for me, then I can keep going. Kyrie Brown committed heinous and awful crimes for which she has been prosecuted and convicted. But as plaintiff's counsel admitted to Judge Hagerty below, the claims that they assert against the defendants in this case would be unprecedented. No court has ever held an online business potentially liable for failing to stop a violent criminal from misusing its routine services to harm others. Counsel started with negligence, and so I'd like to start there and in particular with the questions about causation. Now courts routinely dismiss negligence claims as a matter of law in circumstances like this where a violent criminal's deliberate premeditated criminal acts are such a predominant cause of plaintiff's injuries that it renders the defendant's alleged negligence insignificant and breaks the plausible chain of causation. And there's two components to that. One is that causation requires that the acts of the defendant be a substantial factor in causing the plaintiff's injury. And the second, that it be reasonably foreseeable and the intervening act of a predominant cause in the form of deliberate premeditated criminality bears on both of those. It renders insignificant the acts and so not a substantial factor of the defendants, and it also breaks the plausible chain of causation. The Colorado Supreme Court analyzed this question in the Rocky Mountain case, in particular focused on the difference between sort of forewarned acts and ones that are the result of random and extreme acts of violence. And it compared a shooting at an abortion facility where there had been a series of specific threats against the abortion facility to, for example, cases involving the Aurora movie theater or the Columbine school shooting where the violence came out of the blue. And the specific allegations in the complaint make clear that Brown was the predominant cause. He created the luring content. Brown and the Rolands agreed to meet in person near midnight. He brought a gun. He persuaded the Rolands to follow them to a remote complex. Once there, he tried to rob them. And so all of the allegations, which are just laid out in the complaint, make clear he was the cause. To Judge Mathison, to your question, yes, causation is an element of all of the claims. And if the court's convinced that causation, as the district court was, is a problem, then that suffices to resolve all of the claims. So it's the same standard for every one of them, including the CPPA claim? So the claims are all—causation is an element of all of the claims, and they're all based on sort of common law principles of causation. And I think this sort of—a good example of this is from the SEC fraud context, the Erica B. John—Erica John Fund case, I think, from the Supreme Court, which talks about how the burden in a fraud case is to show there wasn't an intervening cause, which was the actual cause of the injury. So I think causation—this concept of a predominant cause breaking the chain of causation and rendering it significant is present for all of them. Briefly, if the court has questions about the difference between nonfeasance and misfeasance, we do think this is appropriately, as the district court concluded, considered a nonfeasance case. The duties are laid out in paragraph 72 of the complaint, and those duties are all inaction duties. The duty to assure the identity of the sellers were not false, to ensure that all products listed on the application were legitimate, to vet individuals who became verified sellers. These are allegations of inaction. And we think that the two cases that are most helpful in this are the Dyaroff case from the Ninth Circuit and the Supreme Court's recent Tomna decision, both of which involved claims of what we view as even more affirmative action by a website. These were recommendations that connected the user to allegedly harmful content. And in both of those cases, the courts viewed that as nonfeasance, not— What would be the best Colorado case supporting these? As nonfeasance cases? Yeah. So the Rocky Mountain case, the second half of the Rocky Mountain decision, talks about the National Planned Parenthood Organization, and they're very similar duties, as we laid out in our brief, of having a security regime. And they say you should have trained the local chapters of implementing these security regimes, and you failed to implement those security regimes, and that would be nonfeasance. And there's actually another case. We did cite the Rocky Mountain case in our brief, but just for the court, in preparing, I identified another case that I think has a similar concept, which is the Western Innovations v. Sona 12 Corp. That's 187P3-1155. It's a 2008 Colorado appellate court decision. And the claim in that case was an asserted nonfeasance on the idea that the defendant had promised to monitor a burglary alarm and had allegedly failed to monitor the burglary alarm system, and as a result, a fire had burned down a warehouse. And the court in that case viewed that as a nonfeasance case, even though there had been this promise. They really said that's an exception to the nonfeasance doctrine for assumed duties, where it is a nonfeasance case, but there's a very narrow exception where you affirmatively take on a duty to act, and that becomes a nonfeasance case. Briefly, I'd like to address Judge Tinkovich. You asked about the profile. We do think the profile is on its face, not misleading to a user. Probably the clearest indication is a big red box that says, in the middle of the profile, it says, ask the user to verify their account. And that, combined with the fact that only one symbol was listed on the account, that there were no reviews yet on the account, showed that there was more verification that you could ask the user to undertake. And that's even without getting to the explanations that were on the Web page. But when you go to the Web site for LetGo, you see that there's a number of different verification methods. Verifying the phone number is simply one of them. How did they communicate with Brown? It's alleged in the complaint that they used this sort of in-app communication device, so there was a mechanism to communicate back and forth, which was a safety mechanism that the platform had set up so that you don't have to provide your own email address. Communicated by text. Well, it's in-app text communication. That's correct. That's correct. Judge Carson, you talked about other statements that were on the Web site, and we do think that's significant. One of the statements that is alleged as misleading in the complaint is this work closely with law enforcement. Right on that page, this is 114 of the appendix. Right next to that is a tip box, and it says, you know, meet in a public place. And throughout the Web site, pages 145 to 146, there's a whole safety tips of how to make your interactions safe. Clearly, there are steps that the platform, the business was trying to take to make this safer, but it was recognizing that buyers need to take their own precautions, too, and there are things you can do, like meet during the day, meet in a public location, check the VIN number of a vehicle before you purchase it. All of those are laid out in the complaint, and that's before you even get to the terms of conditions, which are, I think, at 140 of the appendix, which, as Your Honor mentioned, actually expressly say, we're not vouching for our users. We have specific safety features that are available, but we're not categorically saying everyone here is trustworthy. The last thing I want to address, unless the Court has other questions, is amendment. Judge Matheson, you asked, I think, correctly about an obligation to come forward and actually ask for amendment and describe what you would do. There is a single-sentence request in the conclusion section of the opposition to the motion to dismiss that asked for leave to amend. At the hearing, Judge Hegarty repeatedly questioned plaintiff's counsel and said, well, what would you add? What more could you say? And it is true counsel said, I would talk to the daughter of the plaintiff, but he didn't say, here's what I would add, and here's how it would cure the defects in the complaint. And even in their appellate briefs, they don't come forward with, here's a list of the factual allegations that I'm prepared to add to a second amended complaint and how that would cure the specific defects that the district court identified. I think under those circumstances, it was an abuse of discretion to not permit leave to amend. So unless the Court has any further questions, I'm happy to allow my offer of counsel to answer any offer of specific questions or reserve, you know, leave the Court's time. Well, you might address the district court's 230 analysis as well. I'm happy to do that, Your Honor. So I don't think the Court needs to reach the section 230 issue. It's an alternative ground for affirmance, but we do believe the district court erred in its analysis. 230, we think the ACCU-SEARCH, this Court's ACCU-SEARCH decision is the leading precedent, and it distinguishes between when a business, quote, specifically encourages development of what is offensive about the content or is neutral with respect to the offensiveness of the content. And what that sets up is a distinction where the platform has provided the content that is harmful or has simply provided a neutral series of tools that operate the same, regardless of the type of content that's available here. I think the clearly harmful content in this case is the luring ad that Kyrie Brown had posted on the platform, and there's no question that the act here was simply to publish that content. The district court pointed to the phone number verification symbol, and we say that's simply a neutral tool that was made available to all users that operated on SMS verification, that operated on inputs from the users, and then conveyed that we had confirmed this is a working phone number. Could I just ask on this issue? One of the things the Rolands point to is the statement about working closely with law enforcement. They think that that was either exaggerated or misleading. Wouldn't those statements about working with law enforcement, that wasn't provided by someone other than Letgo? So why would 230 cover that? Thank you, Your Honor. So I agree that was a statement that was provided by Letgo, and one way I think to analyze the problem would be to say, well, okay, well, is that pled with particularity? Is it too general a statement to be an actionable statement? Once that falls out, what's left, and is what's left sufficient to survive Section 230? That would be one way to analyze the problem. What courts often do in 230 cases also is ask, is this really artful pleading? Is that really the harmful content that is at the heart of the claims, or is the real harmful content at the heart of the claims, the ad that was published by Kyrie Brown and that lured the Rolands into this horrible crime? And I think whichever way the court goes, ultimately the heart of the case, we believe, is a claim to hold the business responsible for a court publishing duty, which was laid out in paragraph 72 of their complaint, which goes through the duties they say that the platform didn't do, which was to vet the users, check the content, and so on. That is a core publishing duty to decide whether to allow certain content to be published or not published. And the last thing I'll say on this is we think the Marshall's locksmith case from the D.C. Circuit, which we cite in our brief, is an excellent example of the operation of the neutral tools principle. In that case, the claim was that Google had allegedly misrepresented certain supposedly scam locksmiths as local because it generated a map pinpoint that seemed to show that the locksmiths were in a particular location. Google got that information by pulling it off of the websites of the locksmith, and some of those had addresses. That's pretty classic third-party information, but some just said, here's a phone number, and Google sort of intuited from the phone number a more specific location. It put a pinpoint on the map. It made it look like it was even more local than the phone number would necessarily have indicated in the D.C. Circuit. So even in that circumstance where the sort of neutral mechanism by which you're translating third-party information into a graphical display, that's still a neutral tool because it sort of works the same regardless of the content. We think that's equivalent to the verification with the phone symbol that was present here. Unless the court has further questions, I do want to make sure if the court has questions for Offrod that we give you a chance. Thank you, counsel. I don't hear any questions. You're excused. Both of you are excused. The case is submitted.